# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOHN MALONE, VERONICA MALONE, and AHLESE, LLC, | : : | |
| *Plaintiffs,* | : | CIVIL ACTION NO. 17-CV-1694 |
| vs. | : : | |
| HOWARD WEISS and WENDY WEISS, | : | Jury Trial Demanded |
| *Defendants*. | : | |

## ORDER

AND NOW, this _____ day of _____, 2016, upon consideration of the Defendants' Motion to Dismiss and the Plaintiffs' Response and any reply, it is hereby ORDERED that the Motion is DENIED.  Defendants are FURTHER ORDERED to file an Answer to the Complaint within fourteen (14) days of the date of this Order.

BY THE COURT:

_____
Hon. Wendy Beetlestone, U.S.D.J.

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JOHN MALONE, VERONICA MALONE, and AHLESE, LLC, | : : | |
| *Plaintiffs,* | : | CIVIL ACTION NO. 17-CV-1694 |
| vs. | : : | |
| HOWARD WEISS and WENDY WEISS, | : | Jury Trial Demanded |
| *Defendants*. | : | |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO THE
DEFENDANTS' MOTION TO DISMISS COUNTS III, IV, AND V OF THE
<u>PLAINTIFFS' COMPLAINT</u>**

**I.     INTRODUCTION**

This action for negligent and intentional misrepresentation, breach of contract, and fraud arises out of the sale of a business, Second Opinion Inc. ("Second Opinion"). At the time of the sale, Second Opinion was presented to the buyer as a going concern, actively engaged in connecting hundreds of lawyers to health care professionals, who could serve as expert witnesses in medical malpractice and personal injury litigation.

In order to induce the sale of Second Opinion, its then owners, the Weisses, made false representations about the nature of the business and the assets of the business that were to transfer at the time of sale. As a direct result of those misrepresentations, Plaintiffs took a large loan to purchase Second Opinion. Within a year, the business closed because the vital intellectual property and goodwill capital, all of which was purchased, either never existed or did not transfer with the business when it was sold.

Under the Purchase Agreement, the Weisses agreed to sell, transfer to, and deliver certain assets of the business, including the databases of Second Opinion's past and present clients (attorneys using the service), and the list of physicians and other medical professionals available to serve as experts. Indeed, without these databases, there is really no business at all. These

materials were not turned over at closing and the Weisses continued to withhold them for many months.  In fact, when the assets were turned over, there was nothing of use delivered.  Again, either the materials were intentionally kept back, even though they had been purchased, or they never existed at all and the deal was a sham.

Second Opinion is now inoperable and valueless.  Yet, the Weisses continue to operate a similar business, using the same name, in the same geographic location in direct violation of restrictive covenants in the agreement and suggesting that the entire sale was a sham, intentionally designed to enrich the Weisses at the Plaintiffs' expense.

## II.     FACTUAL BACKGROUND

In or about August 2015, the Malones, who were in search of a business to purchase and operate, contacted a business broker, Benjamin Ross Group, LLC ("Benjamin Ross"). (Doc. 1, Compl. ¶ 7).  Located in Southampton, Pennsylvania, Benjamin Ross advertised itself as the most experienced broker and acquisitions firm in the Mid-Atlantic Region.  (Doc. 1, Compl. ¶ 8). Benjamin Ross, through its agent Michael Meyer, identified Second Opinion as a business for the Malones to buy. Mr. Meyer provided the Malones with information describing the business of Second Opinion. (Doc. 1, Compl. ¶ 9).

Second Opinion was described as a service business which connected lawyers representing personal injury plaintiffs to doctors and other medical professionals who would serve as expert witnesses for medical negligence and other kinds of personal injury cases.  (Doc. 1, Compl. ¶ 10).  As a result of the information given to them by Benjamin Ross, the Malones were introduced to Defendants, the then-owners of Second Opinion.  (Doc. 1, Compl. ¶ 11). Defendants represented to the Malones that the business was an easy business to learn, one that could be operated from home, and one that could be run by people without any experience in the legal or medical fields.  (Doc. 1, Compl. ¶ 12).

During the Malones' due diligence period, Defendants represented that Second Opinion had a client base of over 700 attorneys and over 1,000 medical professionals available to act as experts.  (Doc. 1, Compl. ¶ 13).  Defendants further represented to the Malones that Second Opinion had over 150 active client files at the time the business was being offered for sale and that "Second Opinion" generated a monthly income of approximately $25,000.  (Doc. 1, Compl. ¶¶ 14, 15).  As a result of the representations made to them by the Defendants, the Malones agreed to purchase Second Opinion for the sum of $770,000.00.  (Doc. 1, Compl. ¶ 18).

In order to pay the purchase price for Second Opinion, the Malones had to obtain financing through a bank or lending institution.  (Doc. 1, Compl. ¶ 16).  Benjamin Ross connected the Malones with Centrix Bank in Doylestown, Pennsylvania, where they were able to secure a loan through the federal Small Business Administration. (Doc. 1, Compl. ¶ 17).

On or about December 17, 2015, the Malones attended a closing conducted at the Benjamin Ross offices.  At the closing, the documents purportedly necessary to consummate a transfer of ownership of Second Opinion to the Malones, including the Purchase Agreement, were signed.  (See Purchase Agreement, attached hereto as Exhibit "A"). (Doc. 1, Compl. ¶ 19). In exchange for the purchase price, Defendants agreed to sell, convey, transfer and deliver various assets of Second Opinion to the Malones and/or Ahlese, LLC, including goodwill and intellectual property assets.  (See Purchase Agreement at ¶ 1, 20).

In addition, the Purchase Agreement provides that Defendants, the Weisses, owe the twenty-four (24) weeks of training after closing at no charge to the Malones/Second Opinion. (See Purchase Agreement at ¶ 15) (Doc. 1, Compl. ¶ 22).  Defendants also agreed that, for two years following the closing, they would not, directly or indirectly, compete with the Malones or Second Opinion by engaging "in the expert witness and medical malpractice consulting services

3

to attorneys business, within a radius of one thousand (1,000) miles of the location of the business being sold" (the "Non-Compete Clause").  (See id. at ¶ 14) (Doc. 1, Compl. ¶ 23).

At the closing, the Malones requested that the Defendants turn over certain of Second Opinion's assets to them, including Second Opinion's client list and its list of doctors and other medical professionals that would potentially serve as experts for Second Opinion's clients. (Doc. 1, Compl. ¶ 24). Although the Malones and/or Ahlese were the lawful owners of Second Opinion after the closing, Defendants refused to turn over these Second Opinion assets.  Instead, Defendants represented that the information would be delivered once the post-closing training began.  (Doc. 1, Compl. ¶ 25).

When the training began, however, Defendants still refused to produce these assets to the Malones.  At that time, Defendants represented that they would not provide the client information until they thought the Malones were ready to receive the information, after the training.  (Doc. 1, Compl. ¶ 26).  Nonetheless, the Malones attempted to work with Defendants to learn more about operating Second Opinion, and to transition the business to the Malones' full operation and control.  (Doc. 1, Compl. ¶ 27).

Although the Malones and/or Ahlese, LLC were now the lawful owners of Second Opinion, during the training and after it, the Weisses continued to operate Second Opinion as their own, refusing repeated demands by the Malones to turn the business over to them.  (Doc. 1, Compl. ¶ 28).  During the training and after it, Defendants shut-out, marginalized and excluded the Malones from having any interaction the Second Opinion's clients, who were continuing to use Second Opinion's services after the closing.  (Doc. 1, Compl. ¶ 29).  During training and after it, the Weisses continued to use Second Opinion's intellectual property assets for their own benefit and not for Second Opinion's benefit, and diverted business from Second Opinion to

themselves. The asked Second Opinion's clients to send new business to them and accepted the payment for the work, even though the Weisses were no longer Second Opinion and they entered into a restrictive covenant as part of the deal. (Doc. 1, Compl. ¶ 30).

On or about July 1, 2016, nearly seven months after the Plaintiffs purchased Second Opinion, Defendants purportedly turned over some of the Second Opinion assets to the Malones, by delivering to the Malones, in Pennsylvania, a large quantity of medical records supposedly related to cases being handled by Second Opinion. (Doc. 1, Compl. ¶ 31). However, the records delivered by Defendants to the Malones related to closed, inactive, or moribund matters which had no value. To this day, Defendants never turned over Second Opinion's client lists of and medical professionals ready to serve as experts, nor Second Opinion's active matters filed. (Doc. 1, Compl. ¶ 32). As a result of this failure to turn over the assets of the business, as provided for in the Purchas Agreement, the Second Opinion business that was purchased from the Defendants became an inoperable business in the summer of 2016. (Doc. 1, Compl. ¶ 33).

### III. ARGUMENT

#### A. Standard of Review

To survive a motion to dismiss pursuant to Fed.R.Civ.P. 12 (b)(6), a plaintiff is required to plead "only enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic v. Twombly*, 550 U.S. 544, 570 (2007). Plausibility does not "impose a probability requirement at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of" the alleged wrongdoing. *Id.* at 556. Even after *Twombly*, however, the standard remains that courts must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. County of Allegheny*, 515 F. 3d 224, 233 (3d. Cir. 2008).

In *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009), the Court clarified the *Twombly* inquiry as two-pronged.  First, the court should consider the sufficiency of the complaint, identifying the factual allegations that are to be accepted as true and those allegations that are legal conclusions and are not entitled to the assumption of truth.  *Id.*  Second, the court must consider whether the factual allegations plausibly suggest the plaintiff is entitled to relief.  *Id.*  To determine plausibility, the court should be "context-specific" and "draw on its judicial experience and common sense."  *Id.*  A complaint may not be dismissed merely when it "strikes a savvy judge that actual proof of those facts is improbable."  *Twombly*, 127 S. Ct. at 556.  The claims must have facial plausibility, meaning the factual content in the complaint allows the court to draw the reasonable inference that defendant is liable for the misconduct alleged.  *Ashcroft v. Iqbal* 556 U.S. 662, 678 (2009).

Here, when the facts pleaded in the Complaint are taken as true and all inferences are drawn in the light most favorable to the Plaintiffs, a reasonable factfinder could well conclude that they are entitled to relief on each Count III (breach of contract) Count IV (breach of non-compete) and Count V (common law fraud).  Accordingly, the motion should not be granted and Counts III, IV and V of the Complaint survive this motion to dismiss.

      **B.**      **The Weisses Are Parties to the Purchase Agreement.**

The Defendants argue that Count III, alleging their breach of contract should be dismissed because they are not parties to the purchase agreement described in the Complaint.  However, in particular they ignore Paragraph 15 of the agreement, which places express obligation on the Weisses not to operate a competing business with Second Opinion.  In addition, Paragraph 20, governing enforceability, expressly contemplates personal responsibility on the Weisses in that it refers to "Sellers," when elsewhere in the contract the singular form of the word is used.  Finally, if the agreement is not enforceable against the Weisses, it is meaningless,

since the business, Second Opinion, LLC, expressly including that trade name, was transferred at closing.  As of closing, Second Opinion, LLC, was nothing more than a façade for the previous owners, the Weisses.  Enforceability of the contract for expressly contemplated future performance issues (e.g. training, consulting, and ongoing non-competition) requires the Weisses to be personally liable for such performance.  Regardless of any issues of contract interpretation, the Weisses are expressly bound by Paragraph 15 of the purchase agreement and are, therefore, proper defendants in Count III stating a claim for breach of contract.

Under New Jersey law, a plaintiff has stated a valid claim for breach of contract if she pleads: (1) the existence of a contract between the parties; (2) a breach of the contract; (3) damages flowing from the breach of contract; and (4) the party making the claim performed its own contractual obligations.  *Video Pipeline, Inc. v. Buena Vista Home Entm't., Inc.,* 210 F. Supp. 2d 552, 561 (D.N.J. 2002).  The Defendants do not challenge the contract itself, or that it was breached.  Their only challenge is that they were not parties to the contract.  It is clear on the face of the contract that there was intent for the Weisses personally to be bound by the terms of the contract, even if the contract is styled as between Second Opinion, LLC and Plaintiff Ahlese, LLC.

> 1. **The contract contains a restrictive covenant that is expressly intended to bind the Weisses.**

The purchase agreement contains an express, enforceable obligation on the Weisses. Paragraph 14 reads:

> The Seller *and its principals* agrees that for a period of two (2) years following the closing on the sale under this Agreement, Seller will not directly or indirectly as an owner, manager, partner, stockholder, employee, or in any other capacity whatsoever, or by or through any person or entity, engage in the expert witness and medical malpractice consulting services to attorneys business within a radius of one thousand (1,000) miles of the location of the business being sold.

7

(Defts. Mot., Ex. B). Wendy Weiss signed the Purchase Agreement for Second Opinion as its President. There can be no question that at a minimum, Wendy Weiss is a principal of the business sold in the transaction and that Wendy Weiss is expressly prohibited from operating a competitive business under the clear, unambiguous terms of the agreement. Discovery may demonstrate that her husband, Howard Weiss, was also a principal of Second Opinion, also bound by this provision.

The Weisses' sale of their business to Plaintiffs included the sale of the name of the business. (See, Defts. Mot., Ex. B, Paragraph 1). In order for any portion of the contract, including, but not limited to, the restrictive covenant stated in paragraph 15 to have any legal force and effect, the agreement must necessarily be enforceable as against the Weisses, since the Plaintiffs would otherwise be obligated to sue their own company (Second Opinion) for non-competition to seek relief. Under New Jersey law, the contract must be construed as a whole, with preference given for all contract language to be ascribed meaning and effect. *Assisted Living Assocs., LLP v. Moorestown Twp.,* 31 F. Supp. 2d 389, 399 (D. N.J. 1998) (applying New Jersey law)(internal citations omitted). Reading this provision without enforcing it against the Weisses would be a legal absurdity and clearly runs afoul of the plain language and meaning of the Purchase Agreement.

The Purchase Agreement also contains an express provision in Paragraph 14 obligating the Weisses to provide training to the Malones. Paragraph 14 reads:

> "*Seller to train Buyer* for twenty four (24) weeks after closing (not to exceed 40 hours per week) at no cost to Buyer. After the twenty four (24) week period has terminated, *Seller shall be available via telephone* for no more than four (4) hours per month for a six (6) month period at no cost to Buyer."

(Defts. Mot., Ex. B, Paragraph 15). Again, if "Seller" is defined solely as Second Opinion, LLC, this paragraph, too, would be meaningless. A business entity cannot train itself. Nor can it be

8

available to advise anyone "via telephone." From the face of the Purchase Agreement, it's clear that what was intended was to obligated the Weisses to train the new operators of Second Opinion in exchange for the negotiated purchase price of the business. If this obligation had been meant to run only to Second Opinion, it would be nonsensical and meaningless. Second Opinion was a going concern with a long operations history by the date of closing. Second Opinion did not need training, its new owners did.

These express provisions in the contract unquestionably bind the Weisses and those provisions were breached. Accordingly, the Weisses are properly named as defendants.

### 2. The enforceability provision, Paragraph 20, expressly contemplates that the contract is enforceable against the Weisses.

Defendants argue that the contract language used in paragraph 20 of the Purchase Agreement prevents the Malones from being able to enforce the contract against them. Their argument is based on a reading of provision that is inconsistent with everyday language usage.

The Defendants point to the participial phrase "including without limitation . . .," to suggest that they are specifically protected from this suit by paragraph 20. But participial phrases function as an adjective in the sentence under proper grammatical form. In paragraph 20, this phrase is placed directly adjacent to the words "parties hereto," making it clear that the phrase is intended to describe the word "parties." In everyday use, when framing a sentence, we normally place participial phrases close by the nouns or pronouns they describe. Failure to do so in drafting creates confusion--the same type of confusion that the Defendants try to create here.

Applying ordinary grammar, according to paragraph 20, those who may enforce the contract or obtain its benefits include the parties *and* their representatives. With respect to enforcement, the contract "shall not . . . be enforceable by . . . any Person other than the parties hereto, including without limitation any representative of either Purchaser or Seller." With

respect to the benefits, the contract "shall not inure to the benefit of . . . or create any right or cause of action in any Person other than the parties hereto, including without limitation any representative of either Purchaser or Seller." Clearly, this wording does not preclude the Malones from enforcing rights under the Purchase Agreement or attempting to collect any benefits available under the Agreement.[1] Count III of the Complaint should not be dismissed because paragraph 20 of the Purchase Agreement permits enforcement against, *inter alia,* the Weisses.

### 3. Piercing the corporate veil is potentially an available remedy here.

Next, the Weisses claim that they can be liable to the Plaintiffs for breach of contract only if the Court pierces the corporate veil. First, for all the reasons previously addressed in this memorandum, the contract contemplates enforcement against the Weisses without piercing the corporate veil. Even if it does not provide a right of enforcement against the Weisses, piercing the corporate veil may be appropriate under the facts as pleaded in the Complaint. The Weisses acknowledge in their motion that under New Jersey law, principals of a business entity may be held personally liable under a theory of piercing the corporate veil for a breach of contract when certain elements are met and to avoid a fraud, including lack of redress without permitting the veil to be pierced. Indeed, the Weisses cite to *Craig v. Lake Asbestos of Quebec, Ltd.,* 843 F.2d

---

[1] If the drafters of the contract had intended to deny the Malones any right of enforcement, they could have chosen language that would have put the matter beyond question. For example, the contract could read, "[T]his agreement shall not inure to the benefit of, be enforceable by, or create any right or cause of action in any Person other than the parties hereto, which do not include any representative of either Purchaser or Sellers." Plaintiffs believe that the terms of the contract are clear and unambiguous and permit them to enforce the contract against the Weisses as principals of the "Sellers." But, it may be that this provision contains an ambiguity. Ambiguity is a question of law for the Court to decide, but if a contract is ambiguous, the interpretation of the ambiguous terms is a factual decision for the jury to make. *Teamsters Industrial Emp. Welfare Fund v. Rolls-Royce Motor Cars, Inc.,* 989 F.2d 132, 135n.2 (3d Cir. 1993); *Strikeforce Techs., Inc. v. Whitesky, Inc.,* 2013 U.S. Dist. LEXIS 96832, Civ. Action No., 13-1895, *18 (D.N.J. Jul. 11, 2013). Contract language is ambiguous "if it is reasonably susceptible of different constructions and capable of being understood in more than one sense." *Assisted Living of Moorestown, LLP,* 31 F. Supp. 2d at 398. If the Court finds there is an ambiguity here, Plaintiffs are entitled to probe the intention of the parties in discovery and submit the varied interpretations to a jury for determination based on the extrinsic evidence of the intent of the parties. Regardless of whether this term is ambiguous, Count III should not be dismissed because this provision permits enforcement as against principals, including the Weisses.

145 (3d Cir. 1988), which sets forth the basis for piercing the corporate veil in the Third Circuit (when applying New Jersey law). The corporate veil may be pierced where (1) there is no separation between the individual and the corporation, or where the separation ceases to exist; and (2) the circumstances suggest that maintaining the fictional separation between the corporate entity and the individual would promote injustice or give sanction to a fraud. *Id.* Here, the allegations of fraud within the Complaint give rise to the potential that the corporate veil may be pierced in order to avoid a miscarriage of justice. Indeed, for all the reasons stated in sections B.1. and B.2., above, if the Weisses are not considered parties to the contract, certain of the provisions are rendered meaningless. Further, when the circumstances are fully considered, the evidence may suggest that the Plaintiffs were intentionally misled during the negotiations. Accordingly, the Weisses are properly named as defendants in this case.

   **C.  The Malones Have Standing to Bring this Claim.**

  John and Veronica Malone are co-plaintiffs in this matter, with a limited liability company, Ahlese, LLC, of which they are the sole members. The Defendants argues that the Malones do not have standing to bring any claims arising out of the contract because they are not parties to it. Of course, it is axiomatic that one must be a party to a contract in order to bring a claim arising out of it. (*See*, argument, *supra*, Section II.B, generally). For all the reasons stated above, there are certain provisions of the Purchase Agreement, particularly those in Paragraph 15 regarding training, that make no sense if the obligations do not run from principal to principal, but rather from entity to entity.

  But, even if the Court disagrees and finds that Paragraph 15 provides for duties running from the Weisses to Ahlese, LLC, and not the Malones, this does not change the fact that John and Veronica Malone are proper plaintiffs on the fraud based claims stated in Counts I, II, and V. There is no basis to dismiss any count for lack of standing. The Defendants do not contest that

co-plaintiff Ahlese, LLC has standing to pursue any contract claims arising out of the Purchase Agreement.

### D. The Fraud Claim Is Not Legally Barred.

The Defendants argue that Plaintiffs' claim in Count V of the Complaint (Doc. 1) is barred by the gist of the action doctrine and the economic loss doctrine because under Pennsylvania law,[2] generally, matters sounding in contract may not lie in tort.  There is a well-recognized exception to this rule for claims of fraud.

The gist of the action doctrine acts to foreclose tort claims where the ***only*** duty owed by the defendant to the plaintiff is one arising out of a contractual relationship.  *See Reardon v. Allegheny College,* 2007 PA Super 160, 926 A.2d 477, 486-87 (Pa. Super. Ct. 2007)(emphasis supplied).  A breach of contract can nevertheless give rise to an actionable tort when the wrong alleged is the "gist of the action," and the contract is merely collateral.  *eToll, Inc. v. Elias/Savion Advertising Inc.,* 2002 PA Super 347, 811 A.2d 10, 14 (Pa. Super. Ct. 2002).  Plaintiffs are limited to their contract claims only when the obligations of the parties are defined *solely* by the terms of the contract, and not by larger social policies embodied in the law of torts.  *Bohler-Uddeholm Am., Inc. v. Ellwood Group, Inc.,* 247 F.3d 79, 104 (3d Cir. 2001), *cert. denied,* 534 U.S. 1162 (2002).  The related economic loss doctrine bars a tort plaintiff from recovering purely

---

[2] The Court has diversity jurisdiction over this matter.  As the Defendants' papers note, there are two states having an interest in this matter, New Jersey, which is the law under which the contract between the parties was formed and is to be enforced, and Pennsylvania, where the business operates and the Plaintiffs reside.  In a diversity action, the Court is to resolve any choice-of-law issues applying the law of the forum state; here, Pennsylvania law. *Klaxon v. Stentor Electric Mfg. Co.,* 313 U.S. 487 (1941); *Calhoun v. Yamaha Motor Corp.*, 216 F.3d 338, 343 (3d Cir. 2000).  Under Pennsylvania law, if there is no conflict of law, there is no analysis to be performed and the court will apply the law of the forum state.  Where two states have an interest in the matter, but the laws of the two states are the same, there is a "false conflict," which should be avoided, and the law of the forum state should be applied.  *Berg Chilling Sys. v. Hull Corp.*, 435 F.3d 455, 462 (3d Cir. 2006) (citations omitted).  There is no conflict of laws here.  New Jersey law will be applied to the contract claims under the express terms of the contract and Pennsylvania law applies to the fraud claim, since the forum state is Pennsylvania. If, for any reason the contract is invalidated, Pennsylvania law would be applied to the entire matter.

economic losses. *See, e.g., Bilt-Rite Contractors, Inc. v. Architectural Studio,* 581 Pa. 454, 459, 866 A.2d 270, 273 (Pa. 2005).

The gist of the action doctrine was designed to preserve the distinction between contract and tort causes of action and to preclude a plaintiff from converting a contract action into a tort claim. Tort actions involve breaches of common law duties imposed by social policy, while contract actions involve breach of duties created by mutual agreement. *See, e.g., eToll, Inc. v. Elias/Savion Advertising, Inc.,* 811 A.2d 10, 14 (Pa. Super. 2002). A breach of contract may give rise to an actionable tort when the wrong alleged is the "gist of the action" and the contract is merely "collateral." *Id. See Bohler-Uddeholm Am. Inc. v. Ellwood Group, Inc.,* 247 F.3d 79, 104 (3d Cir. 2001), *cert. denied,* 534 U.S. 1162 (2002).

The gist of the action doctrine applies only (1) where the claims alleged arise *solely* from the contractual relationship between the parties; (2) where the duties breached were created and grounded in the contract; (3) where the liability stems from the contract; and (4) where the tort claim essentially duplicates the contract claim, or the success of which depends on the terms of the contract. *eToll*, 811 A.2d at 19. Similarly, the rationale of the economic loss rule is that tort law is not intended to compensate parties for losses suffered as a result of a breach of duties assumed only by agreement. *Palco Linings, Inc. v. Pavex, Inc.*, 755 F.Supp. 1269, 1271 (M.D. Pa. 1990).

The Pennsylvania Supreme Court recently decided in *Bruno v. Erie Ins. Co.,* that whether the gist of the action doctrine applies as a bar to recovery turns on "the nature of the duty alleged to have been breached." *Bruno v. Erie Ins. Co.,* 106 A.3d 48, 68 (Pa. 2014). The Court there clarified:

> If the facts of a particular claim establish that the duty breached is one created by the parties by the terms of their contract—*i.e.*, a

13

> specific promise to do something that a party would not ordinarily have been obligated to do but for the existence of the contract—then the claim is to be viewed as one for breach of contract….If, however, the facts establish that the claim involves the defendant's violation of a broader social duty owed to all individuals, which is imposed by the law of torts, and, hence, exists regardless of the contract, then it must be regarded as a tort.

*Id.* The obligation not to enter into false agreements predicated on false promises made with the intention to deceive is the very kind of duty that is universal and is not created on a contract by contract basis.

Indeed, when a claim is made for fraud, it is axiomatic that the defendant did not intend to honor or be bound by the false promises made in any contract between the parties. Accordingly, the gist of the action doctrine cannot be applied when fraud claims are made. *Mirizio v. Joseph,* 4 A.3d 1073, 1080-85 (Pa. Super. Ct. 2010).

Here, the analysis does not turn on the existence of a contract, but rather is narrowly focused on the Weisses' conduct. It is alleged in Counts I and II (which the Defendants have not moved to dismiss), that the Weisses made false promises to induce the sale. Count V, for common law fraud, essentially alleges that the Weisses made these false promises with the intent to take the Plaintiffs' purchase money, but not actually sell anything to them. This is not a matter of enforcing the Purchase Agreement. Indeed, there was nothing to sell at the time and nothing to transfer now. The deal itself was a sham. Fraud is generally an exception to the gist of the action doctrine, even when a breach of contract claim is also asserted. *Mirizio,* 4 A.3d at 1084-85.

At this stage of litigation, there are sufficient facts pleaded to provide notice of the Plaintiffs' claims and to allow this matter to proceed to discovery. On the face of the Complaint, assuming the pleaded facts are true, Count V, stating a fraud claim, is sufficient to reach a jury. Accordingly, the Weisses are not insulated from Count V, as a matter of law, under the gist of

the action doctrine or under the economic loss doctrine. Accordingly, the motion to dismiss Count V must be denied.

## IV. CONCLUSION

For each of the foregoing reasons, the Counts III, IV, and V of the Plaintiffs' Complaint (Doc. 1) survive this motion to dismiss. Indeed, there are provisions of the contract between the parties that are enforceable as against the Weisses, personally. Furthermore, the Malones, individually, have standing to bring this lawsuit, and the fraud claim stated in Count V is not barred by the gist of the action doctrine or the economic loss doctrine. Therefore, the motion to dismiss must be denied.

Respectfully submitted:

**HAINES & ASSOCIATES**

 /s/ Clifford E. Haines
CLIFFORD E. HAINES (PA 09882)
DANIELLE M. WEISS (PA 201067)
The Widener Building, 5th Floor
1339 Chestnut Street,
Philadelphia, PA 19107
(215) 246-2200 (T)
(215) 246-2211 (F)
*Attorney for Plaintiffs, John and Veronica Malone and Ahlese, LLC*

Dated: July 24, 2017

**CERTIFICATE OF SERVICE**

      I, Clifford E. Haines, hereby certify that, on this date, I caused a true and correct copy of the foregoing Corporate Disclosure Statement to be served on all counsel of record via the Court's ECF system to:

Richard L. Bazelon, Esquire
Michael A. Shapiro, Esquire
Bazelon Less Feldman, PC
One South Broad Street
Suite 1500
Philadelphia, PA 19107

Dated: July 24, 2017                        */s/ Clifford E. Haines*
                                                                          Clifford E. Haines